UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————————————

JENNIFER DIEPENHORST,

                Plaintiff,                      Case No. 1:05-CV-734

v.                                      HON. GORDON J. QUIST

CITY OF BATTLE CREEK &
SERGEANT BRUCE PENNING,

                Defendants.
_____/

## OPINION

      Plaintiff, Jennifer Diepenhorst, filed a complaint against Defendants, City of Battle Creek (the "City") and Sergeant Bruce Penning, alleging sexual harassment and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, 42 U.S.C. § 1983, and the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* Now before the Court are the City's and Penning's motions for summary judgment. For the following reasons, the Court will grant the motions for summary judgment.

## I. Background

      Jennifer Diepenhorst was employed as a forensic evidence technician by the City of Battle Creek Police Department from March 2000, through June 2004. The City is a municipality in the State of Michigan. Sergeant Bruce Penning is a police officer with the City's Police Department.

      Penning served as a road patrol sergeant and in 2001 became the sergeant in charge of the Special Investigations Unit. Diepenhorst was a civilian employee in the forensic lab, which was supervised by Sergeant Martin Brown, and Penning was not in Diepenhorst's chain of command.

(Diepenhorst Dep. at 19, 403; Penning's Br. in Supp. Mot. Summ. J., Ex. P.)  Diepenhorst began attending the police academy in 2002 to become a police officer and graduated in June 2003.

Diepenhorst and Penning began having sexual relations in August 2002.  Diepenhorst and Penning continued their sexual relationship until December 2002, when Penning attempted to reconcile with his ex-wife.  The sexual relationship resumed in March 2003, and continued until August 2003, when Penning again attempted to reconcile with his ex-wife.   In May 2003, Penning and Diepenhorst engaged in act of anal intercourse.  Although Diepenhorst did not say "no" to Penning during the act, Diepenhorst had indicated to Penning on previous occasions that she did not want to engage in that act.  Following the first act of anal intercourse, Diepenhorst and Penning engaged in the act an additional 5 to 10 times, with no objection by Diepenhorst.

The sexual relationship did not carry over to the workplace.  On one occasion, Diepenhorst's supervisor, Sergeant Brown, observed Penning undoing the fastener in Diepenhorst's hair.  After Diepenhorst's coworker informed Brown that Diepenhorst wanted this behavior to stop, Brown confronted Penning regarding his actions, and Brown did not observe any recurrence of this behavior.  There were no other harassing acts that were observed between Penning and Diepenhorst in the workplace.[1]

In January 2004, Diepenhorst was placed on the City's Police Officer Eligibility List after passing the City's test for police officer eligibility.  At that point, Diepenhorst, along with the others on the list, was eligible to be offered a conditional position by David Headings, the Chief of Police, pending medical and psychological screening.  Because Diepenhorst was only eligible to be certified

---

[1]Diepenhorst identified an incident where Penning called her on her Nextel walkie-talkie while she was at work and engaged in phone sex, although Diepenhorst only listened to Penning and did not reciprocate because she was busy working and did not think Penning's actions were appropriate for that setting. (Diepenhorst Dep. at 345.) Diepenhorst also mentioned that she and Penning kissed in the garage at work on one occasion and that Penning "touched" her once in the lab.

as an officer for one year following her graduation from the police academy, she needed to be hired by mid-June 2004 in order to be certified, or else she would have to take another certification course.

The City compiled a background report on Diepenhorst which contained statements from several officers that they were concerned about whether she had the right personality for a police officer. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. N.)  The City did not extend an offer to Diepenhorst, although she remained on the eligibility list, and she accepted an offer from the Calhoun County Sheriff's Department.  Diepenhorst gave notice of her resignation from her forensic tech position to the City on June 1, 2004.  Although Diepenhorst did not work after June 1, 2004, she was paid through June 13 based on her remaining vacation and compensation time. (Defs.' Reply Br. to Pl.'s Sur-Reply Br. at 6 & Exhibit Q.)

In September 2004, the City learned that Diepenhorst was claiming that Penning raped her. The City conducted a full investigation and decided not to take any action because: (1) the sexual relationship occurred outside of work; (2) the City had not been adequately notified; (3) Diepenhorst did not plan to pursue criminal charges against Penning; and (4) there had been no violation of City policy arising out of the relations between Diepenhorst and Penning. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. I.) Diepenhorst filed a complaint with the Equal Employment Opportunity Commission (EEOC) on April 7, 2005, and commenced this lawsuit on October 25, 2005.

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*  The court must draw all inferences in a

3

light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)). Drawing all inferences in favor of the non-moving party does not require the court to accept mis-characterizations of the actual record.

## III. Discussion

### A.    Title VII and the Timeliness of Diepenhorst's EEOC Complaint

Title VII of the Civil Rights Act of 1964 requires that victims of discrimination file a charge with the EEOC within either 180 or 300 days after the alleged unlawful practice occurred. 42 U.S.C. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05, 122 S. Ct. 2061, 2068 (2002). In Michigan, the charge must be filed within 300 days of the unlawful practice, even if the plaintiff does not file a charge with the Michigan Department of Civil Rights. *Campau v. Orchard Hills Psychiatric Ctr.*, 946 F.Supp. 507, 510 (E.D. Mich. 1996).

Diepenhorst filed her EEOC complaint on April 7, 2005. Diepenhorst argues that the limitations period for filing her EEOC complaint began on June 13, 2004, her last date of employment with the City, and that the EEOC complaint was timely because it was filed within 300 days of that date. Diepenhorst claims that the hostile environment leading to her constructive discharge existed up until her last date of employment and, alternatively, that the City could have remedied its failure to hire her as a police officer up until that date.

The Defendants argue that the limitations period began to run on June 1, 2004, the date Diepenhorst gave the City notice of her resignation. Diepenhorst's EEOC complaint, according to the Defendants, was untimely because it was filed 310 days later. The Defendants argue that

Diepenhorst failed to exhaust her administrative remedies and that her Title VII claims should be dismissed.

The Defendants point to a Second Circuit case concluding that a plaintiff's constructive discharge claim accrues on the date that the plaintiff gave the employer "definite notice" of her intention to cease her employment. *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000). The court explained:

> This is essentially the converse of the discriminatory discharge case where the date the employer gives notice of termination to the employee is controlling for purposes of accrual.  In the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave. . . . The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged.

*Id*. at 138-39. Although the Sixth Circuit has not addressed the issue of when the period begins to run when an employee gives notice of resignation, it has followed the Supreme Court's line of cases finding that when the employer gives notice of termination, the period begins to run on the date that a plaintiff "receives a notice of termination, not when his employment actually ceases." *Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987) (citing *Chardon v. Fernandez*, 454 U.S. 6, 102 S. Ct. 28 (1981), and *Delaware State College v. Ricks*, 449 U.S. 250, 101 S. Ct. 498 (1980)). *See also Campau*, 946 F.Supp. at 510.  As discussed by the Second Circuit in *Flaherty*, the fact that it is the employee, rather than the employer, who gives notice of separation is not determinative. Therefore, in instances of alleged actual or constructive discriminatory discharge, the statutory period for filing an EEOC charge begins to run on the date that definite notice of separation is given by either the employer or the employee, not the date on which the employment actually ceases.

5

Diepenhorst claims that because the alleged hostile work environment which created the constructive discharge did not cease to exist upon her giving notice of resignation, but continued to her last date of employment, the limitations period for filing her EEOC claim did not begin to run until her last date of employment, which was the last date she was exposed to the environment allegedly creating the constructive discharge. However, the Defendants note that while Diepenhorst alleges her last date of employment to be June 13, 2004, she did not work after June 1.[2] Rather, Diepenhorst used her remaining compensatory and vacation time to continue to be paid through June 13, 2004. (Defs.' Reply Br. to Pl.'s Sur-Reply Br. at 6 & Exhibit Q.) Therefore, Diepenhorst's claim that the alleged hostile work environment persisted until June 13 has no basis, because Diepenhorst did not report to work after giving her notice of resignation on June 1.

Alternatively, Diepenhorst argues that the City "had the power to activate her certification" up until June 13, 2004. (Pl.'s Sur-Reply and Br. in Opp'n to Defs.' Mot. Summ. J. Replies at 6.) This assertion is also incorrect, as Diepenhorst's period of eligibility for certification as a police officer expired on June 5, 2004. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. N.) Assuming that the City's alleged failure to hire continued until Diepenhorst's certification eligibility expired on June 5, 2004, her filing of an EEOC claim on April 7, 2005, was still untimely.

Based on the fact that Diepenhorst gave notice of her resignation on June 1, 2004, and did not file her EEOC complaint until April 7, 2005, Diepenhorst's Title VII claims must be dismissed because of her failure to timely file administrative charges with the EEOC.[3]

---

[2]Diepenhorst's first day of work with the Calhoun County Sheriff's Department was June 4, 2004. (Diepenhorst Dep. at 263.)

[3]If Diepenhorst's Title VII claims were properly before the Court, they would be analyzed under the same framework as her Elliott-Larsen Civil Rights Act claims. "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (citing *Hall v. State Farm Ins. Co.*, 18 F.Supp.2d 751, 766 (E.D. Mich.1998)). *See also Jamison v. Dow Chem. Co.*, 354 F.Supp.2d 715, 733 (E.D. Mich. 2004) ("For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases.").

**B.      Elliott-Larsen Civil Rights Act Claims**

**1.      ELCRA Statute of Limitations**

An employment discrimination claim under the Elliott-Larsen Civil Rights Act ("ELCRA")

must be filed within three years of when it accrued.  M.C.L. § 600.5805(9).  As recently stressed by

the Michigan Supreme Court, "'three years' means three years."  *Garg v. Macomb County Cmty.*

*Mental Health Servs.*, 472 Mich. 263, 284, 696 N.W.2d 646, 659 (2005). "An employee is not

permitted to bring a lawsuit for employment acts that accrue beyond this period." *Id.*  M.C.L. §

600.5805 does not contain any provisions permitting a plaintiff "to recover for injuries outside the

limitations period when they are susceptible to being characterized as 'continuing violations.'" *Id*.

at 282, 696 N.W.2d at 658.  Diepenhorst filed her complaint on October 25, 2005, so any event

giving rise to a cause of action that occurred prior to October 25, 2002, is not properly before the

Court.

**2.      Quid Pro Quo**

Michigan law prohibits sexual harassment based on the theories of *quid pro quo* harassment

and hostile work environment harassment.  Section 37.2103 of the Elliott-Larsen Civil Rights Act

provides, in part:

> (I) Discrimination because of sex includes sexual harassment. Sexual harassment
> means unwelcome sexual advances, requests for sexual favors, and other verbal or
> physical conduct or communication of a sexual nature under the following
> conditions:
> (*I*) Submission to the conduct or communication is made a term or condition either
> explicitly or implicitly to obtain employment. . .
> (*ii*) Submission to or rejection of the conduct or communication by an individual is
> used as a factor in decisions affecting the individual's employment[.]

To establish a claim of *quid pro quo* harassment, a plaintiff must show: (1) that she was subject to

any of the types of unwelcome sexual conduct or communication described in the statute, and (2)

that her employer or the employer's agent used her submission to or rejection of the proscribed

conduct as a factor in a decision affecting her employment. *Champion v. Nationwide Sec., Inc.*, 450 Mich. 702, 708-09, 545 N.W.2d 596, 599 (1996). If these requirements are met, an employer is vicariously liable for the sexually harassing acts of its agents. "The statute expressly addresses an employer's vicarious liability for sexual harassment committed by its employees by defining 'employer' to include both the employer and the employer's agents." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 310, 614 N.W.2d 910, 915 (2000).

### a.      "Unwelcomeness" of the Sexual Conduct or Communication

Diepenhorst must show that the sexual conduct or communication complained of was unwelcome. The Defendants argue that as of October 25, 2002, Diepenhorst and Penning were involved in a consensual relationship and that Penning's sexual conduct or communications cannot be called "unwelcome" by Diepenhorst. Diepenhorst must have "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68, 106 S. Ct. 2399, 2406 (1986). "The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.*

Looking at the evidence in its totality, Diepenhorst has not shown that the sexual relations with Penning were unwelcome. Diepenhorst participated in two separate periods of sexual relations with Penning. During the interval between these relations, Diepenhorst dated another individual, but ended that relationship when she resumed having sexual relations with Penning. (Diepenhorst Dep. at 148-49.) Diepenhorst explained the concept of "friends with benefits" or "fuck buddies" to Penning. (*Id.* at 102-03.) Diepenhorst and Penning met two or three times per week over the course of their relationship. (*Id.* at 117, 208-09.) Diepenhorst admitted to often answering the door in the nude when Penning came over. (*Id.* at 135.) Although she stated that her subjective intent was to

get the encounter over with more quickly, when viewed objectively, the act of answering the door in the nude contradicts her contention that sexual relations were unwanted. Diepenhorst would go to Penning's house, let herself in, and climb into bed with him. (Penning Dep. at 219.) Diepenhorst participated in phone sex with Penning and initiated it on at least one occasion. (Diepenhorst Dep. at 170-71.) Diepenhorst also accepted gifts from Penning and told him that she loved him, at least as a friend. (*Id*. at 137, 168.) Finally, Diepenhorst occasionally went to dinner with Penning. (Penning Dep. at 219.)

Diepenhorst has shown that on one occasion in May 2003, she was subjected to an unwanted sexual act of anal intercourse. She did not object to the act immediately prior to or during its occurrence. But, Diepenhorst had indicated to Penning on at least one prior occasion that she did not want to engage in anal intercourse. (Diepenhorst Dep. at 186-89.) Whether the nature of the particular act of anal intercourse on this particular occasion was or was not welcome may be debatable. However, assuming that this incident of anal intercourse was non-consensual, this assumption does not render the sexual relationship between Diepenhorst and Penning unwelcome. Following this unwanted act, the relationship continued and Diepenhorst and Penning subsequently engaged in anal intercourse with mutual consent on at least 5 occasions. (*Id*. at 177.) Unlike the case cited by Diepenhorst, which found that a quid pro quo claim can be maintained where a relationship begins as consensual but later becomes unwanted, here there is no evidence that Diepenhorst overtly acted to end the relationship with Penning. *See Pergine v. Penmark Mgmt. Co., Inc.*, 314 F. Supp. 2d 486 (E.D. Pa. 2004). Even after the non-consensual act, the relationship continued until August 2003, when Penning, not Diepenhorst, ended the relationship. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. at 5; Diepenhorst Dep. at 101.) Following the end of the relationship, Diepenhorst attempted to maintain contact with Penning and, although he rebuffed her

attempts to remain friends, he continued to serve as a reference for her police officer applications. (Diepenhorst Dep. at 228.)  Based on the totality of the circumstances, Diepenhorst did not, by her conduct, indicate that Penning's sexual advances and the sexual relationship were unwelcome.

### b.    Condition Affecting Employment

In addition to failing to establish that the sexual relationship with Penning was unwelcome, Diepenhorst is unable to show that the Defendants used her submission or participation in the sexual relationship as a condition affecting her employment.

### (1)    Alleged Acts of Penning Affecting Employment

Under Michigan law, "quid pro quo harassment only occurs where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit." *Champion v. Nationwide Sec., Inc*., 450 Mich. 702, 713, 545 N.W.2d 596, 602 (1996).  Diepenhorst claims that Penning had supervisory authority over her based solely on his rank as a sergeant, despite the fact that her direct supervisor was Brown and Penning was not within her chain of command.

There is no evidence that Penning had the authority to change the terms and conditions of Diepenhorst's employment.  Diepenhorst argues that as a sergeant, Penning had authority over all those of lesser rank, whether police or civilian employees, and whether or not they were part of the Special Investigations Unit that he commanded.  Diepenhorst argues that she believed Penning could have her fired due to his rank and influence, even though Diepenhorst admitted that Penning was not in her chain of command. (Diepenhorst Dep. at 19.) The only evidence presented by Diepenhorst supporting her claim that Penning had authority over her is one timecard signed by Penning. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. W.)

Diepenhorst admitted that she knew Penning was not in her chain of command. (Diepenhorst Dep. at 19, 403.)  According to City Policies, FC: 201 5.2.5, Diepenhorst was accountable only to the one supervisor who was in charge of her organizational component. (Penning's Br. in Supp. Mot. Summ. J. Ex. P.)  Diepenhorst has not shown how Penning, or any other sergeant, could affect the terms or conditions of her employment.  For example, Brown testified that not only did he, as Diepenhorst's direct supervisor, not have the authority to discipline, suspend, or terminate the employment of Diepenhorst, but that no sergeant had that authority.  (Brown Dep. at 199.)  Where a plaintiff "purports to have had a false impression that the alleged harasser was her supervisor, 'the victim's mistaken conclusion must be a reasonable one.'" *Haseley v. Kelly Services, Inc.*, No. 235023, 2003 WL 22204743, at *3 (Mich. Ct. App. Sep. 23, 2003) (quoting *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S. Ct. 2257, 2268 (1998)).  Here, Diepenhorst's contention that Penning was her supervisor was unreasonable in light of the fact that she was aware that he was not in her chain of command, and because he was in charge of a separate unit in the police department. *See id.* (finding that "especially considering that plaintiff effectively delineated her chain of command" to not include the alleged harasser, "we conclude that any mistaken conclusion was unreasonable as a matter of law").

Furthermore, there is no evidence that Penning's relations with Diepenhorst resulted in a tangible employment action against Diepenhorst.  Diepenhorst argues that after the relationship ended, Penning no longer advised her of drug raids or requested her presence on the scene, so that she did not receive as much overtime pay for time spent working on the scene of Penning's drug raids.  Brown stated that based on his review of Diepenhorst's time sheets, there was no correlation between the amount of overtime she received during her relationship with Penning and the amount she received after the relationship ended.  (Brown Dep. at 12.)  Brown saw no evidence of any

11

association between Diepenhorst's participation in collecting evidence at the scene of raids, or lack thereof, and her overtime hours. (*Id.* at 12-14.) Therefore, Diepenhorst no longer receiving advance knowledge of the drug raids from Penning falls under the category of a "trivial employment action" or "mere inconvenience" resulting in a "bruised ego," and does not rise to the level of materially altering the terms and conditions of her employment. *See White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 795, 797, 799 (6th Cir. 2004).[4]

Diepenhorst admitted that other than her perceived loss of overtime due to not knowing of the raids, she did not suffer any tangible employment action, including a reduction in benefits. (Diepenhorst Dep. at 234-35.) Diepenhorst claims that she lost comp time because Penning no longer asked for her on his raids, but she presents no evidence of the comp time that she lost after the relationship ended, or the comp time that she earned during her relationship with Penning.

Nor is there evidence that Penning had any input into the City's decision not to hire Diepenhorst as a police officer. Chief Headings testified that he relied primarily on the commanders, a lieutenant, and possibly the training sergeant when making his decision not to hire Diepenhorst. (Headings Dep. at 52-54.) Chief Headings also relied on a report which included evaluations of several officers, Penning not among them, and individuals outside of the Battle Creek Police Department who had known Diepenhorst prior to her working as a forensic lab tech. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. N; Headings Aff. ¶ 9.) Chief Headings recalled speaking with a group of officers, not including Penning, who expressed their opinions of Diepenhorst. (Headings Dep. at 55-57; Headings Aff. ¶¶ 8-9.) Chief Headings expressly denied speaking with Penning

---

[4]Federal court interpretations of Title VII provisions provide guidance to courts interpreting the ELCRA, although such federal interpretations are not binding on questions arising under the ELCRA. *See Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 314, 628 N.W.2d 63, 69 (2001) (internal citation omitted) ("In interpreting provisions of the CRA, we are guided by federal court interpretations of the counterpart federal statute; see title VII of the federal Civil Rights Act of 1964, 42 USC 2000e *et seq.*").

regarding Diepenhorst, and there is no evidence indicating that Penning had any input in the decision

not to hire Diepenhorst as a police officer. (Headings Dep. at 64; Headings Aff. ¶ 9.)

Finally, Diepenhorst admitted that Penning never explicitly asked her for sexual favors in

return for job benefits.  Although Penning suggested that he would help Diepenhorst get a job as a

police officer with the City, Diepenhorst stated that he never made the comment in the context of

requesting sexual favors or saying that he would only help her if she continued to have sex with him.

(Diepenhorst Dep. at 231.)

For these reasons, Diepenhorst has not shown that Penning committed any acts that affected

the terms and conditions of Diepenhorst's employment.  As a result, Penning is not individually

liable under the ELCRA, and there are no acts of Penning for which the City can be held vicariously

liable.[5]

### (2)      Acts of City Affecting Employment

Diepenhorst contends that Brown denied her training opportunities and that the City

constructively discharged her rather than hire her as a police officer.  However, Diepenhorst does

not present any evidence linking her relationship with Penning to Brown's or the City's alleged

actions related to her employment.

### (a)      Loss of Training Opportunities

Diepenhorst argues that she no longer received training associated with her forensic tech

position because of her relationship with Penning.  Brown testified that he told Diepenhorst when

---

[5]Individuals who are agents of the employer may be liable under the ELCRA.  *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851, 861 (2005).  However, Diepenhorst has not made out a prima facie case of quid pro quo sexual harassment against Penning. In addition to failing to present evidence that the sexual relations with Penning were unwelcome, that Penning affected Diepenhorst's conditions of employment, and that Penning was in a position to alter the terms and conditions of her employment, the complained of sexual actions occurred outside of the workplace, despite Diepenhorst's contention that sergeants were considered to be on duty at all times.  Therefore, Diepenhorst also failed to show that Penning was acting as an agent of the City when he engaged in sexual relations with Diepenhorst.

she began her police academy studies that she would no longer be receiving training for her forensic tech position because the City did not want to spend money to train individuals who were planning to leave the unit.[6] (Brown Dep. at 157-60.)  Another civilian lab tech, Terra Wesseldyk, likewise did not receive additional training when she indicated her intention to leave the forensic unit to become a law enforcement agent. (*Id*.)  Brown also identified a police officer who, around this time, was nearing retirement and could no longer receive training. (*Id*. at 158.)  Diepenhorst cannot show a connection between her relationship with Penning and the end of her forensic training, or that she was treated differently from other City employees who had expressed their intentions to depart.

### (b)      Constructive Discharge

Diepenhorst claims that she was constructively discharged following the end of her sexual relations with Penning.  Diepenhorst contends that after her relationship with Penning ended, her superiors, primarily Brown, no longer supported her attempt to become a police officer with the City. Contrary to Diepenhorst's claim, the background investigation report dated April 8, 2004, indicates that Brown stated that Diepenhorst would make a good police officer with proper guidance and training. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. N.)  The only negative remark made by Brown was that Diepenhorst "gets along with some co-workers and not so well with others" and that she "sometimes rubs people the wrong way." (*Id*.)

Furthermore, despite Diepenhorst's claims that the attitudes of her supervisors changed following the end of her relations with Penning,  Diepenhorst's immediate supervisor prior to Brown, Sergeant Victor Pierce, raised the same concerns regarding her qualifications as Brown,

---

[6]Diepenhorst graduated from the police academy in 2003, and Brown stated that he knew she was in the academy in 2002, but it is unclear when Brown informed Diepenhorst that her forensic training would end.  Because Diepenhorst claims that Brown's attitude towards her changed in late 2003, after her graduation from the academy, (Diepenhorst Dep. at 229), it appears that her forensic training ceased several months before the time that she claims Brown's attitude towards her changed due to her relations with Penning.

reporting that "her interactions with some co-workers were questionable" and that "she sometimes comes across as 'moody.'" (*Id*.) Like Brown, Pierce also indicated that Diepenhorst "would make a good police officer with proper molding and mentoring," although "in her personal interactions with other officers he [did] have some question."[7] (*Id*.)

Additionally, Diepenhorst is unable to show that the City was aware of the alleged unwanted sexual act or the relationship with Penning. First, there is no evidence that the City had notice of the alleged sexual relations. The evidence does not support Diepenhorst's assertions that "everyone knew" something was going on between Diepenhorst and Penning. In fact, the testimony of Diepenhorst's fellow officers indicates that she kept the relationship a secret, and those whom she did inform did not speak of the relationship with others, at Diepenhorst's request.[8]

Most importantly, neither Diepenhorst's superior nor anyone else in higher management knew of the relationship. While Diepenhorst claims that Brown should have known of the relationship from circumstantial evidence, the testimony of her coworkers indicated that it was a well-kept secret. Brown stated that he did not know of the relationship between Diepenhorst and Penning until she filed her complaint with the City in September 2004, and that it seemed like he "was the last to find out." (Brown Dep. at 192.) When Brown did learn of the relationship, he met with Terra Wesseldyk, Bob Corbin, and Joel Shepperly, who were the individuals under his supervision in the forensic lab, to find out why they did not tell him about the relationship. Of these individuals, only Wesseldyk acknowledged knowing of the relationship. (*Id*. at 189-90.) Wesseldyk,

---

[7]The report recommended that Diepenhorst continue through the application process, despite the expressed concerns regarding her interactions with fellow officers.

[8]Officer Brad Duck stated that he was surprised when he learned of the relationship from a fellow officer in 2005, because he "just never saw it." (Duck Dep. at 29.) Officer Julie Hubbard indicated that although Diepenhorst told her she was involved with someone, she did not reveal that it was Penning. (Hubbard Dep. 9-10.) Diepenhorst stated that this conversation occurred in late fall or early winter of 2003. (Diepenhorst Dep. at 404.) Hubbard stated that she figured out that it was probably Penning but did not confirm that with Diepenhorst. (Hubbard Dep. 9-11.) Officer Thomas Rivera stated that he learned of it after Diepenhorst was hired by Calhoun County. (Rivera Dep. at 40.)

however, did not know of the relationship while it was occurring, and only learned of it in 2004 when Diepenhorst confided in her and asked her not to tell anyone. (Wesseldyk Dep. at 63-64, 67.) Because Diepenhorst has not shown that the City had constructive knowledge of the sexual relations with Penning, she is unable to show that the City could have constructively discharged her due to the sexual relations.[9]

### (3)    Failure to Hire

Diepenhorst has not shown that the City failed to hire her on the basis of her sex.  Because there is no direct evidence that Diepenhorst's sex, or the sexual relations between Diepenhorst and Penning, played any role in the City's decision not to hire Diepenhorst, she must establish her claim through the *McDonnell Douglas* burden-shifting framework.  A prima facie case requires that Diepenhorst show that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) the job was given to a similarly situated person. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 463, 628 N.W.2d 515, 521 (2003).

Diepenhorst fails to show a prima facie case because she does not identify a similarly situated employee who was given the police officer position she sought.  To be considered similarly situated, "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (internal quotation marks omitted). "Relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (citing *Ercegovich*, 154 F.3d at 352).

---

[9]Diepenhorst also conceded that she accepted a position with the Calhoun County Sheriff's Department because she only had a short time in which to become a certified police officer.

Of the two candidates hired from the eligibility list on which Diepenhorst was placed, there is no evidence that either candidate had ever been a civilian forensic tech or supervised by Brown. One of the candidates was a male cadet, while the other was a female public safety officer from a neighboring township who had a background in both public safety and firefighting.  (Headings Aff. ¶¶ 5-6.)

Even if Diepenhorst established a prima facie case, she would be unable to rebut the City's non-discriminatory justifications for its decision not to hire her.  The City submitted evidence supporting its position that the decision not to hire Diepenhorst was based on inconsistent reports regarding her ability to perform the duties of a police officer. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. Ex. N; Headings Dep. at 52-54, 55-57; Headings Aff. ¶ 9.)  As previously discussed, Diepenhorst has offered no evidence that the chief of police was aware of the sexual relations between Diepenhorst and Penning.  The evidence shows that the majority of those who worked in Diepenhorst's department, including her superior, were unaware of any relationship between Diepenhorst and Penning while Diepenhorst was still employed by the City.  Therefore, Diepenhorst has not presented sufficient evidence to support an inference that those in the decision making positions had constructive knowledge of the sexual relations, and, in turn, that such knowledge influenced the City's decision not to hire her.

### 3.    Elliott-Larsen Civil Rights Act Hostile Work Environment

To establish a prima facie case of hostile work environment under Michigan law, a plaintiff must show: (1) that she belonged to a protected group; (2) that she was subjected to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) that the unwelcome sexual conduct or communication was intended to, or in fact did, substantially interfere with her employment or created an intimidating, hostile, or offensive work

environment; and (5) respondeat superior. *Radtke v. Everett*, 442 Mich. 368, 382-83, 501 N.W.2d 155, 162 (1993). An employer "must have notice of alleged harassment before being held liable for not implementing action." *Chambers v. Trettco, Inc.,* 463 Mich. 297, 312, 614 N.W.2d 910, 916 (2000). An employer on notice of alleged harassment may avoid liability "if it adequately investigated and took prompt and appropriate remedial action." *Id*. "The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some fault on the part of the employer." *Id*. Diepenhorst is unable to show that, under the totality of the circumstances, the sexual relations with Penning were unwanted, that the sexual relations were intended to or did create a hostile environment, or respondeat superior liability to the City.

### a.        Unwelcome Sexual Conduct

As discussed previously, while Diepenhorst has shown, at best, that she was subjected to one sexual act that, because it was anal intercourse, was unwelcome, the totality of the circumstances indicates that her relationship with Penning cannot be categorized as "unwelcome." Even assuming that the one act is sufficient to satisfy that requirement of a prima facie case, for the following reasons, Diepenhorst has not established the other elements of a prima facie case.

### b.        Intentional or Actual Creation of a Hostile Environment

To determine whether a hostile environment existed, the question is "whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke v. Everett*, 442 Mich. 368, 394, 501 N.W.2d 155, 167 (1993). Michigan courts have found that "single incidents *may* create a hostile work environment - rape and violent sexual assault are two possible scenarios," as they are "extremely traumatic" episodes. *Id*. at 395, 501 N.W.2d at 168.

Diepenhorst raises two occurrences of harassment that occurred in the workplace. The first involved Penning repeatedly unfastening Diepenhorst's hair clip. There is no dispute that Diepenhorst did not complain of these incidents to her superiors.

The second occurrence was a phone call made by Penning to Diepenhorst while she was at work, in which Penning attempted to have phone sex with an unwilling Diepenhorst. (Diepenhorst Dep. at 345.) Unlike the hair clip incidents, the phone sex was communication of a sexual nature. Diepenhorst stated that she believed it was inappropriate because anyone at work could have overheard it and because Penning was trying to reconcile with his ex-wife at that point. (*Id.* at 345-46.) There is no evidence that anyone witnessed this incident, and Diepenhorst admitted that she made no attempt to turn off the phone. (*Id.* at 345.) Diepenhorst also stated that she and Penning engaged in phone sex outside of work multiple times, including at least one instance that she initiated and which occurred after the incident in the workplace. (*Id.* at 170-71, 242.) Therefore, the single act of phone sex at work is insufficient to show that a reasonable person, based on the totality of the circumstances, would have perceived the act as creating a hostile work environment.[10]

With regard to the unwanted sexual act that occurred outside the workplace, Diepenhorst has not shown that this created an intimidating, hostile, or offensive employment environment.[11] "Generally, hostile work environment sexual harassment is 'unwelcome sexual conduct *in the workplace* that *unreasonably interferes with an employee's work performance*.'" *Pepperman v. Gen.*

---

[10]Diepenhorst also mentioned that Penning kissed her in the garage at work and "touched" her once in the forensic lab when no one else was there. (Diepenhorst Dep. at 334.) Diepenhorst did not complain about these acts and does not argue that they were unwanted.

[11]Assuming that the unwanted anal intercourse creates an issue of fact regarding whether it was "extremely traumatic" and sufficient to create a hostile work environment, strict liability does not attach because the standard "does not establish strict liability for sexual assault by a co-worker or supervisor, because an employer must be found vicariously liable via the doctrine of respondeat superior." *Radtke v. Everett*, 442 Mich. 368, 395 n. 41, 501 N.W.2d 155, 168 n. 41 (1993). Therefore, even if there is a genuine issue of fact regarding the creation of a hostile work environment, Diepenhorst must show respondeat superior liability.

*Motors Corp.*, No. 197097, 1997 WL 33339576, at *2 (Mich. Ct. App. Nov. 4, 1997) (emphasis included) (quoting *McCallum v. Dep't. of Corr.*, 197 Mich.App. 589, 596, 496 N.W.2d 361, 365 (1992)).  Diepenhorst does not dispute that the unwanted anal intercourse occurred outside of the workplace, aside from her contention that Penning, as a sergeant, was considered to always be on duty. (Pl.'s Br. in Opp'n to Defs.' Mots. Summ. J. at 6.)

Even assuming that this act could be imputed to the workplace, the evidence does not support Diepenhorst's claim that it created a hostile work environment.  The "essence of a hostile work environment" is that the "atmosphere is so infused with hostility" toward the plaintiff that the plaintiff's conditions of employment are altered. *Radtke v. Everett*, 442 Mich. 368, 385, 501 N.W.2d 155, 163 (1993) (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988)).  Following the incident, Diepenhorst continued her relations with Penning for three more months, remained employed with the City for another year, and did not report the incident to any superiors until after her employment with the City ended and she was pressured to do so by members of the police department.  Diepenhorst also sought to continue her employment with the City, albeit as a police officer rather than a forensic lab tech.  While Diepenhorst argues that she was traumatized by the incident, the evidence indicates that she did not perceive her work environment to be hostile or that the incident unreasonably interfered with her work performance.

### c.   Respondeat Superior

Respondeat superior liability can be imposed on an employer for an employee's hostile work environment claim "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851, 861 (2005).  Actual notice is not required, "rather, the test is whether the employer knew or should have known of the harassment." *Id*.

Diepenhorst's hostile work environment claim fails because there is no evidence that the City had notice that Penning was sexually harassing Diepenhorst. "Notice is considered adequate if, under the totality of the circumstances and viewing the circumstances objectively, a reasonable employer would have known there was a substantial probability that an employee was being sexually harassed." *Haseley v. Kelly Servs., Inc.*, No. 235023, 2003 WL 22204743, at *4 (Mich. Ct. App. Sep. 23, 2003) (citing *Sheridan v. Forest Hills Pub. Schs.*, 247 Mich. App. 611, 621-22, 637 N.W.2d 536, 542 (2001)). In this case, it is undisputed that Diepenhorst did not complain of any harassment to Brown or any other individuals in higher management. The only harassment that anyone ever observed in the workplace was Penning's removal of Diepenhorst's hair clip.[12] When Diepenhorst mentioned to her co-worker Wesseldyk that she wished Penning would stop, Wesseldyk informed Brown, who took immediate remedial action by ordering Penning to stop messing with Diepenhorst's hair. Based on the general lack of any knowledge of the relationship in the workplace, and the fact that the only harassing act observed in the workplace was Penning's undoing of Diepenhorst's hair clip, Diepenhorst cannot show that Brown or anyone else in higher management had constructive notice of the relationship and the alleged hostile work environment.

Finally, when the City did learn of Diepenhorst's complaints regarding Penning's alleged sexual assault in 2004, after her resignation, the City conducted an investigation and placed Penning on administrative leave pending a final report. Because the City took corrective action once it learned of the alleged harassment, respondeat superior liability cannot be imposed on the City. *See Elezovic,* 472 Mich. at 426, 697 N.W.2d at 861.

---

[12] Penning was not the only officer who touched Diepenhorst's hair. Diepenhorst and Brown both identified other officers who messed with Diepenhorst's hair. (Diepenhorst Dep. at 291-92; Brown Dep. at 201.)

**4.**     **Retaliation**

Although Diepenhorst did not plead retaliation in her complaint, she alleges in her briefs that she feared retaliation by the Defendants.  However, Diepenhorst is unable to establish that she was retaliated against.  A prima facie case of retaliation requires that a plaintiff prove that (1) she engaged in protected activity; (2) the defendants knew that she engaged in protected activity; (3) she suffered an adverse employment action; and (4) the protected activity and the adverse action were causally connected.  *Henderson v. Walled Lake Consolidated Schs.*, 469 F.3d 479, 491 (6th Cir. 2006); *Pena v. Ingham County Road Comm'n*, 255 Mich.App. 299, 310-11, 660 N.W.2d 351, 358 (2003).

Diepenhorst cannot establish a prima facie case because it is undisputed that Diepenhorst did not engage in protected activity during her employment by the City.  Diepenhorst did not complain of sexual harassment during her employment, did not file her complaint with the EEOC until 310 days following her notice of resignation, and never filed a complaint with the Michigan Department of Civil Rights.  While employed by the City, Diepenhorst never complained to her supervisor or any other higher management in the City regarding Penning's actions.[13]  Therefore, Diepenhorst cannot show retaliation.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant City of Battle Creek's motion for summary judgment and Defendant Bruce Penning's motion for summary judgment.

An Order consistent with this Opinion will be issued.

Dated:  April 17, 2007                                          /s/ Gordon J. Quist
                                                                        GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE

---

[13]Wesseldyk, not Diepenhorst, reported to Brown that Diepenhorst did not want Penning to unfasten her hair clip.

22